

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| AP-KNIGHT, L.P., | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § CIVIL ACTION NO. 6:03-1577-HFF |
| | § |
| AHOLD FINANCE USA, INC., | § |
| | § |
| Defendant. | § |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

This is a case to enforce a commercial lease.  The Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332.  The Court tried the case on May 11-12, 2005, in Spartanburg, South Carolina, and it now finds that judgment should be awarded to Plaintiff AP-Knight (AP-Knight).

## II.    FINDINGS OF FACT[1]

1.

Defendant Ahold Finance USA, Inc. n/k/a Ahold Information Services ("Ahold") entered into

---

[1] The Court has carefully examined the proposed findings of fact and conclusions of law submitted by both parties.  Due to the complexity of the case and in order to reach the correct legal conclusion, the Court has found it necessary to adopt many of the proposed findings of fact submitted by AP-Knight.  At the same time, many of the factual findings submitted by both parties are not in dispute.

a commercial lease (the "Lease") dated December 19, 1995, with Koger Equity, Inc. ("Koger Equity"). Pursuant to the terms of the Lease, Ahold leased space in the "Marion Building," one of several two-story buildings located in the "Koger Center" in Greenville, South Carolina.

2.

The original Lease covered approximately 19,403 square feet of space and had a term running from February 1, 1996, through April 30, 1999.

3.

The parties amended the Lease a number of times, and in the last amendment the term of the Lease was extended through April 30, 2004.

4.

The base rent due from Ahold during the last three years of the Lease term was as follows:

| | |
|---|---|
| May 1, 2001 to April 30, 2002 | $30,464.28 per month; |
| May 1, 2002 to April 30, 2003 | $31,073.00 per month; and |
| May 1, 2003 to April 30, 2004 | $31,694.75 per month. |

5.

In addition to base rent, Ahold agreed to pay certain expenses (the "Additional Rent") associated with the operation and upkeep of the Marion Building. That Additional Rent ("Common Area Maintenance" or "CAM" charges) was to be paid in advance each month based on estimates of annual expenses.

2

6.

Ahold also agreed to reimburse Koger Equity for the cost of electricity supplied to the Premises.

7.

The Lease contained a provision that specifically identified events of default by Ahold. Those events included the following: "(1) the Lessee fails to pay any installment of Rent or Additional Rent within fifteen (15) days after the date on which such installment of Rent or Additional Rent first becomes due;" and "(7) the Lessee abandons or vacates the Premises."

8.

Under the terms of the Lease, all sums that were not paid when due accrued interest at the rate of 18% per annum.

9.

Also under the terms of the Lease, the landlord was entitled to recover its costs and expenses of any litigation commenced in order to enforce the Lease against Ahold or to defend claims asserted by Ahold relating to the Lease, including reasonable attorneys' fees.

10.

In December 2001, AP-Knight purchased the Koger Center and a number of other properties from Koger Equity. AP-Knight took an assignment of the Lease in connection with that transaction and, therefore, became the "landlord" under the Lease.

11.

Prior to closing on the transaction with Koger Equity, AP-Knight and its lender, Fleet Bank, N.A. ("Fleet Bank"), requested that Ahold execute a "Tenant Estoppel Certificate" (the "Estoppel Certificate").

12.

Ahold had the Estoppel Certificate reviewed by legal counsel prior to its execution on November 21, 2001. Ahold's corporate representative for purposes of this case witnessed the execution of the Estoppel Certificate for Ahold.

13.

In connection with AP-Knight's acquisition of the Koger Center, Ahold also executed a "Lease Subordination, Non-Disturbance of Possession, and Attornment Agreement" (the "Subordination Agreement").[2] On November 13, 2002, AP-Knight entered into a Management Agreement with Parthenon Realty, LLC ("Parthenon") for the management of the Koger Center. The Management Agreement between AP-Knight and Parthenon was effective as of January 1, 2003.

---

[2] The terms and conditions are not in dispute and the Court sees no reason to recite them herein. Further, based on the Court's ultimate ruling, discussion about giving or failing to give notice under any applicable documents is immaterial.

4

14.

The Management Agreement contained the following provision: "Except as otherwise expressly provided in Section 6.5, this Agreement is not intended for the benefit of any third party, and no such other third party may enforce any rights or obligations arising under the Agreement against Owner or Manager as a third party beneficiary."

15.

Section 6.5 in the respective Management Agreements did not reference any right for tenants at the Koger Center to benefit from or enforce the terms of the Management Agreements and specifically did not reference any right of tenants relating to maintenance standards for the Koger Center.

16.

At the time AP-Knight purchased the Koger Center from Koger Equity, Ahold was not fully occupying the Premises. Most of the Ahold employees who had peviously occupied the Premises had been moved to Ahold's new headquarters building ("1200 Brookfield") after it opened in early 2000.

17.

1200 Brookfield is "Class A" commercial office space. It is located in a campus setting and has numerous amentities that Ahold's employees can use and enjoy, including a health club, a company-subsidized cafeteria, outdoor picnic tables, walking trails, and four lakes. Ahold considered the Marion Building and the Premises therein to be inferior to Ahold's office space at

5

1200 Brookfeld.  In one document, Ahold identified the Marion Building as "grade 'C' office space."

18.

In early 2002, Ahold made the decision to move some of its employees from 1200 Brookfield back to the Marion Building.  The decision to move employees from 1200 Brookfield to the Marion Building did not sit well with the affected employees.  The Court finds that the state of unhappiness about the move caused, in part, the present dispute.

19.

Prior to moving its employees back to the Marion Building, Ahold's Facilities Group (the "Facilities Group") inspected the Premises to see what work needed to be done in order to make it ready for occupancy.  The Facilities Group was supervied by Ahold's Human Resources Group ("HR").  Teresa Medlin held the position of "Director of Human Resources" and directed the Facilities Group.  Ms. Medlin's two principal lieutinants in the Facilities Group were David Mackenzie and Lucia Finley.  Ms. Medlin reported to Steve Kilcoyne, Ahold's Vice President of Human Resources.

20.

As a result of the Facilities Group's inspection of the Marion Building, Ahold identified a number of items that it requested Koger Realty to perform.  Koger Realty did so.  That request for Ahold made no mention of leaking windows or damage to drywall beneath the windows in the Premises.

21.

Ahold retained a contractor to perform work in the Premises that was outside the landlord's responsibility, including painting the interior walls and drop-ceiling of the Premises and cleaning up the work stations. That contractor did not perform work relating to windows or damage drywall.

22.

All of those employees were moved to the first floor of the Marion Building in order to leave the second floor empty and available for subletting. After moving Keith Douglas's Group and Kay Check's Group into the Marion Building, there were at least 75 employees housed on the first floor of the Premises.

23.

At the time that Ahold moved its employees back into the Marion Building, Ms. Finley established with Koger Realty the means by which routine communications about maintenance requests should occur. Ahold maintained a log of telephone calls and written correspondence with Koger Realty relating to maintenance requests on the Marion Building. That log was kept on Ahold's computer on the "C" drive.

24.

On May 3, 2002, Ahold informed Koger Realty that windows "in the lab area" (the "POS

Lab") and in "Section D" of the Premises were leaking.  That report was made in the manner by which Ahold reported routine issues relating to the Premises to Koger Realty.  The communication

was faxed to "Lori and Sandy," secretaries in Koger Realty's office at the Koger Center.  In response to that report from Ahold, Koger Realty's on-site property maintenance personnel caulked the leaking windows.

25.

On June 25, 2002, after Kay Check's Group had moved back to the Marion Building, those employees made a list of complaints and delivered them to Ms. Finley in accordance with the procedure that Ahold had established.  There was no mention in that list of leaking windows or water damage.

26.

There is no evidence of any further written complaints from Ahold relating to any leaking windows until late 2002, and Ahold failed to provide a copy of its log of communications with Koger Realty that might have contained some record of verbal communications.

27.

In early August 2002, Ahold's employees notified Ahold that they believed mold was growing on a window sill of one window in the Premises.In response to that report, an Ahold employee in the Facilities Group sprayed bleach on the window sill during office hours.  One of the Ahold employees whose desk was near the affected window complained of adverse health effects from exposure to the bleach fumes.

28.

Shortly after the incident with the bleach, Ahold re-occupied the second floor of the Marion Building by moving a group of accountants employed by an affiliated company ("Bi-Lo") into that space.  Prior to moving those employees into the second floor of the Premises, Ahold made no complaint to Koger Realty regarding defects in the Premises that would make the second floor untenantable.

29.

There were 93 Bi-Lo accountants that occupied the second floor.  Those Bi-Lo employees brought with them a great deal of paper records.  The paper itself weighed over 30,000 pounds.

30.

As a normal part of the daily activities of the Bi-Lo accounting employees, they shipped and received a great deal of mail and historical accounting records, often as much as five times per day. That mail and other records had to come through the first floor of the Premises from the parking lot.

31.

About the same time that Bi-Lo's accountants occupied the second floor of the Premises, Ahold began receiving health complaints from a small group of employees.  Those employees complained of problems with sneezing, congestion, runny noses, and sore throats.  The five complaining employees were all members of Kay Check's Group and had been in the Premises only since June 21, 2002.  There is no evidence in the record of comlpaints from Bi-Lo's employees.

32.

Mike Schiltz testified that his symptoms began shortly after Bi-Lo's accounting group and its 30,000 pounds of paper records had moved into and began operating on the second floor of the Marion Building.

33.

On September 18, 2002, Ahold met with Jim Currie, Koger Realty's on-site property manager, to discuss the complaints that Ahold was receiving from its employees. That meeting was the first time that Ahold had raised any issue relating to indoor air quality with Koger Realty.

34.

In that meeting, Ahold requested that Koger Realty conduct air quality testing inside the Premises. There is no evidence in the record that written notice was given to AP-Knight or Fleet Bank of Ahold's request as provided in required by the Lease. Ahold's request for air testing was in direct response to requests that Ahold had received from the five complaining employees.

35.

Prior to the meeting with Mr. Currie on September 18, Lucia Finley created another spreadsheat that Ahold intended to use to track its communications with Koger Realty relating to the condition of the Premises. This new spreadsheet was to be maintained on Ahold's computer system on the "G" drive.

36.

Following the meeting on September 18, Mr. Currie and Mr. Mackenzie inspected some of

the windows in the Premises for signs of past water leaks and water damage. Ahold requested that Koger Realty stop the leaks and repair the drywall around the leaking windows.

37.

In response to Ahold's requests, Mr. Currie (a) instructed Koger Realty's on-site maintenance personnel to caulk the leaking windows; (b) stated his intention to contact Carolina Air Care to obtain a proposal for conducting air quality testing; and (c) hired Turn Key Renovations to repair the damaged drywall around several windows.

38.

Mr. Currie informed Ahold in the September 18 meeting that Ahold would be required to pay for the cost of the air quality testing if the testing did not reveal a problem.

39.

Within a week after that September 18 meeting, Koger Realty had already begun repairs around the window in the "POS Lab." That window had the worst leaks of all the windows reported to Koger Realty. Specifically, damaged drywall beneath the window in the POS Lab was removed and the window was caulked.

40.

Mr. Mackenzie inspected the window in the POS Lab after the drywall was removed. Following his inspection, Mr. Mackenzie reported to his boss Ms. Medlin that no mold was present in that wall cavity.

12

41.

On October 2, 2002, Mr. Mackenzie told Ms. Medlin that Koger Realty intended to hire Carolina Air Care to perform air quality testing inside the Premises as requested by Ahold. Ms. Medlin objected to the use of Carolina Air Care, and Mr. Mackenzie informed Mr. Currie that he would hire a different contractor to perform the air quality testing.

42.

On October 3, 2002, Mr. Mackenzie and Mr. Currie met with Robert MacPhee, a professional engineer from Qore, Inc. ("Qore"), at the Marion Building to discuss air quality testing in the Premises. Mr. Mackenzie had contacted Qore and requested the meeting. Following that meeting, Mr. Mackenzie requested that Mr. MacPhee prepare a proposal for that work.

43.

During the course of his inspection of the Marion Building, Mr. MacPhee stated his observation that there was not "enough fresh air being brought into the building" and his belief that "the A/C system and its ductwork may be a big part" of the cause of the employees' complaints.

44.

In response to Mr. Mackenzie's request, Mr. MacPhee wrote a letter proposal dated October 10, 2002, which stated in part as follows:

> The following background information was obtained during a meeting with Ahold's Mr. David Mackenzie and QORE's Mr. Robert MacPhee. The Marion Building is a two story office building located at 650 Executive Center Drive. The building has some minor water intrusion problems associated with caulking around the metal frame windows. It is our understanding that the employees had complaints about allergy like symptoms which they believe to be caused by the indoor air quality of the building. Those people with complaints have had there [sic] offices relocated.

45.

Qore proposed to perform an assessment that included measuring indoor air temperature, humidty, and $CO_2$ content, as well as sampling for the presence of airborne mold spores. Further, Qore specifically indicated its intention to interview the complaining employees.

46.

Mr. Mackenzie then informed Mr. Currie that Ahold had decided not to retain Qore because Ahold did not want its employees interviewed. Mr. Mackenzie further informed Mr. Currie that Ahold would not retain another consultant without discussing the scope of work with Mr. Currie.

47.

Shortly after meeting with Ahold about leaking windows in the Marion Building, Mr. Currie began soliciting proposals for more permanent solutions to the problem with periodic water intrusion around the windows in the Premises.  On October 15, 2002, Mr. Currie received a proposal from Glaztech to re-seal all of the exterior windows on the Marion Building.

48.

During the time all these activities were taking place, Ahold's President, Gary Preston, directed Ahold's executive team to begin studying ways to move its employees out of the Marion Building.  In an email message dated October 7, 2002, Mr. Preston wrote as follows:

> Brian and Patty, Over the last six months we have moved about 40 AIS associates to another building due to space limitations.  I have asked Mike, Teresa and Steve to develop a plan to get them back in the AIS Building.  We are paying outside rent while at the same time we are providing AUSA functions including HR, Accounting, Audit, Business Proc. Engineering and the PMO.  We will also be reconfiguring the work space to eliminate executive offices and move Pat, Marsha, Joe, Ed, Teresa off the fourth floor and into offices closer to their staffs and to the work.  My plan would be to move all non core AIS folks to the other building in an orderly transition.  These groups would then be responsible for their own space expense in the same way that NFR and PPO are responsible today.  I agree with your premise that every group should have their costs fully allocated so that we can manage the overall expense of any service organization.  Mike has mentioned that there is office space very close to the AIS building which might accommodate these groups.  I have asked him to put together a review so that all of us can understand the costs.  In the meantime, we will begin planning the switch between the groups.  As we refocus our IT staff into meeting the needs of the business, we need them all together as a team.

49.

The office space "close to the AIS building" mentioned in Mr. Preston's message is located in a building that Ahold refers to as the "Jacobs Building."    That space was then under lease from

Jacobs Engineering Group, Inc. to Synnex Information Technologies, Inc. ("Synnex"), but was empty and was available for subletting through March 31, 2005.

50.

The Jacobs Building was more desirable to Ahold than the Marion Building for a number of reasons, including proximity to 1200 Brookfield which provides access to the amenities located at Ahold's headquarters building.

51.

On October 16, 2002, Mr. Mackenzie met with another consultant at the Marion Building to discuss air quality testing. That consultant was Andrew Schauder of Environmental Testing & Management ("ETM"). On October 17, 2002, Mr. Schauder transmitted his proposal to Ahold. Ahold did not share Mr. Schauder's proposal with Mr. Currie at that time.

52.

In contrast to Qore's proposal, Mr. Schauder's proposal did not include testing for any condition other than the presence of airborne mold spores.

53.

Mr. Schauder had previously performed an indoor air quality assessment for Bi-Lo, a company affiliated with Ahold. That work was undertaken in connection with a report of respiratory complaints from a Bi-Lo employee and the presence of a water-stained drop-ceiling tile. In that instance, Mr. Schauder tested for indoor air temperature, humidity, and $CO_2$ content. He did no testing for the presence of mold when retained by Bi-Lo.

16

54.

On November 4, 2002, Ahold informed Mr. Currie that it had retained Mr. Schauder to conduct the air quality testing in the Marion Building.

55.

On November 7, 2002, Ahold informed Kay Check and Keith Douglas, the managers of its employees on the first floor of the Marion Building, that their groups would be moved back to 1200 Brookfield during the first week in December 2002.

56.

On November 13, 2002, Mr. Schauder collected sixteen air samples inside the Premises and two air samples on the exterior of the Marion Building.[3]

On December 2, 2002, Mr. Schauder reported the results of his air quality testing to Ahold. Mr. Schauder's testing showed four isolated areas of slightly elevated mold counts, primarily confined to the exterior wall cavities of the Marion Building. All of the counts of total viable mold spores in samples collected inside the Premises were equal to or lower than the counts of total viable mold in samples collected outside the Marion Building that same day.

57.

The interior sample with the highest concentration of total viable mold spores showed 353 colony-forming units per cubic meter of air ("$CFU/m^3$"). The dominant species of mold in that sample ("Sample A-4") was Eurotium.

---

[3] AP-Knight objected to the text of Mr. Schauder's report. This objection is sustained based on the Court's ruling regarding a *Daubert* challenge addressed *infra*.

17

58.

Sample A-4 was collected in an interior hallway.  Mr. Schauder admitted that the presence of Eurotium mold spores in that location was unrelated to any leaks at exterior windows in the Marion Building.

59.

The remaining samples collected inside the Premises had concentrations of total viable mold spores of 63, 28, 56, 28, 63, 14, 42, 28, 56, 35, 42, 113, 28, 21, and 84 CFU/m$^3$.

60.

The results of sampling for viable mold spores are reported in multiples of 7 based on the limitation in the sampling method.  In order to determine how many viable mold spores were actually collected, the reported results should be divided by 7.[4]

61.

All of the counts of total mold spores (viable and non-viable spores) inside the Marion Building were significantly lower than the counts from samples taken outside the Marion Building that same day.  In fact, the interior samples had total mold spore counts that were approximately 10% or less of the concentrations measured in samples collected outside the Marion Building that day.

---

[4]       That mathematical calculation does not work in the case of Sample A-4.  In that sample, ETM reported 318 CFU/m$^3$ of the species Eurotium.  The Court finds that number was simply a typographical error and that the actual mold concentration reported should have been 315 CFU/m$^3$, as that is the closest multiple of 7 (7 x 45 = 315).

62.[5]

Although Mr. Schauder testified at trial that the only meaningful comparison in assessing whether indoor airborne mold levels are acceptable is a comparison between inside and outside concentrations, he previously informed another client that there are generally "acceptable limits" for indoor mold concentrations.  He also suggested to that other client that there could be cases when mold levels indoors could exceed those in the outside air without a significant cause for concern.  Specifically, Mr. Schauder's report from his testing at Travelers Rest High School contained the following statements:

    a.    "Typically, the level of fungi found inside a building is less than that found in the outdoor air.  However, this is largely dependent on how the HVAC system of a given building is configured, how much outdoor air is being introduced into the building and whether there are any other sources for outdoor air to enter the building, i.e., open windows and doors."; and

    b.    "All of the absolute levels of fungi found in this sampling were well within what would be considered to be normal limits."

77.

On January 12, 2000, Mr. Schauder collected samples inside Travelers Rest High School that contained between 105 and 501 CFU/m$^3$.  The outside air sample on that day had a total viable mold spores of 325 CFU/m$^3$.

---

[5] The Court finds the following excerpts of Mr. Schauder's testimony go to the impeachment of his testing of the Marion Building.

78.

On January 13, 2000, Mr. Schauder collected samples inside Travelers Rest High School that contained between 141 and 495 CFU/m$^3$.  The outside air sample on that day had a total of 70 CFU/m$^3$.

79.

On those two days, Mr. Schauder collected 17 indoor samples and two outdoor samples. Nine of the samples collected indoors had concentrations of viable mold that exceeded the concentration collected outdoors on the same day.

80.

One sample that Mr. Schauder collected inside the Travelers Rest High School had a total concentration of viable mold spores that was over seven times higher than what was reported in the outside air on the same day.  Sample A-35, collected in Room 110, had a total of 495 CFU/m$^3$ as compared to a total of 70 CFU/m$^3$ outside.

81.

In the case of Travelers Rest High School, Mr. Schauder made no report of potential health hazards from the presence of mold and did not recommend that the school be closed.  On the contrary, Mr. Schauder's report to the Greenville County School System contained a statement that replacment of pipe insulation with active mold growth "should occur during the summer of 2000" – meaning that the school would be occupied by students, faculty, and staff for at least four more months before that remediation would take place.

82.

Also contary to his trial testimony in this case, Mr. Schauder informed Mr. Shull in December 2002 that concentrations of between 250 and 500 viable spores per cubic meter of air is typical of most buildings in the Greenville area, including buildings that are considered "healthy."

83.

The average concentration of viable mold spores that Mr. Schauder measured inside the Marion Building was 67.12 CFU/m$^3$. The average concentration in the samples that Mr,. Schauder collected outdoors at the Marion Building was 282.5 CFU/m$^3$. Therefore, the average indoor concentration of total viable mold spores at the Marion Building was 23.76% of the average outdoor concentration.

84.

The average concentration of viable mold spores that Mr. Schauder measured inside Travelers Rest High School on January 12 and 13, 2000 was 240.17 CFU/m$^3$. The average concentration in the samples that Mr. Schauder collected outdoors at Travelers Rest High School on those two days was 187.5 CFU/m$^3$. Therefore, the average indoor concentration of total viable mold spores at Travelers Rest High School was 128.08% of the average outdoor concentration.

85.

The only known health effects of exposure to mold for healthy humans are allergic type

reactions, like runny nose, sneezing, sore throat, and congestion.  No one species of mold has been shown to be more injurious to humans than any other.

86.

However, Stachybotrys *chartarum* is widely referred to as "toxic mold" because of its ability to produce aflatoxins.  In the early 1990's, investgiations by the Centers for Disease Control ("CDC") and others resulted in a proposed finding that linked exposure to Satachybotrys *chartarum* with acute ideopathic pulmonary hemorage among infants.  Subsequent detailed reevaluation of the original data by CDC and a panel of experts led to the conclusion that those cases were not linked to exposure to mold.

87.

There is no scientific evidence linking the presence of Stachbotrys *chartarum* molds with adverse health effects from aflatoxins.

The highest level of viable Stachybotrys *chartarum* mold spores that Mr. Schauder identified inside the Marion Building was 21 CFU/m$^3$.  That concentration suggests that there were only 3 microscopic mold spores collected during that sampling event.

The symptoms that are typically reported for exposure to mold spores may be caused by a number of other allegens, including dust and pollen.

88.

Richard Bennett, one of Ahold's experts offered at trial, admitted that paper dust is one of the contributors to unsatisfactory indoor air quality.  He further admitted that paper dust itself is an irritant to the eyes and respiratory system.  Paper that is chemically treated, particularly self-carboning paper, may cause increased irritation to persons exposed.

89.

Mr. Schauder performed no air testing to assess whether any other allergens were present in the Marion Building.  In particular, Mr. Schauder made no assessment of the presence of dust or other particulate matter and whether such airborne agents could be causing the complaints expressed by Ahold's five employees.

One of the Ahold employees who complained about respiratory problems in the Marion Building stated that she had to clean a great deal of dust off her desk every day.

90.

During the time he was investigating the Marion Building, and before Ahold made the decision to vacate the Premises, Mr. Schauder never interviewed any of the five complaining employees in order to assess their general health and the existence of other potential causes of their complaints, including medications they were taking.  Further, Mr. Schauder did not collect any information from the complaining employees about the temporal relationship of their symptoms to other events.

91.

The temporal relationship between the onset of symptoms and other events occurring in and around the affected area is significant in the identification of potential causes of these symptoms.

92.

Mr. Bennett testified that it is standard practice among industrial hygienists to involve a physician in the assessment of health complaints associated with alleged problems with indoor air quality.  Mr. Schauder did not include a health professional in his assessment of the indoor air quality complaints from Ahold's employees and did not recommend that they be examined by a physician.  Ahold did not have its employees examined by a physician.

93.

Mr. Schauder performed no testing to determine the moisture content of the building materials in the Premises even though that is a simple and non-invasive process involving insertion of a moisture meter in the drywall.

94.

Despite the observations of Mr. MacPhee from Qore, Mr. Schauder did not inspect the HVAC system in the Marion Building.  As a result, he was unable to assess how much fresh air was being introduced into the Premises or whether the number of mold spores in the indoor air could be affected by other sources of fresh air.

95.

Mr. Schauder's recollection of his observations was suspect, given the fact that he testified repeatedly that there were wooden windows in the Marion Building, when the other undisputed testimony and photographic evidence established the windows in that building have metal frames. Mr. Schauder discarded his field notes that reflected his observations regarding the condition of the Premises and the windows in the Marion Building.

96.

Mr. Schauder did not assess indoor air temperature, relative humidity, or $CO_2$ content in the Marion Building as part of his investigation.  During the trial, Mr. Schauder explained that his observation of mold growing in the wall cavities made such testing unnecessary to his assessment.

97.

When Mr. Schauder was performing his assessment of Travelers Rest High School, he knew that mold had been observed growing in that building.  Despite that knowledge, he performed a wide range of tests other than tests for the presence of mold, including an assessment of temperature, relative humidity, and $CO_2$ content.

98.

Mr. Bennett had also performed indoor air quality testing for the Greenville County School System prior to his involvement in this case as Ahold's expert.  Mr. Bennett performed an assessment of Buena Vista Elementary School.  In that assessment, Mr. Bennett tested and reported the temperature, relative humidity, and $CO_2$ content of the indoor air, sampled for the presence of and reported the presence of other allergens (including pollen), and conducted an in-depth survey of the health profile of the occupants of the school.

99.

On December 4, 2002, Mr. Currie met with Mr. Schauder and a group of Ahold executives at the Marion Building.  During that meeting, Mr. Schauder told Mr. Currie that some interim measures were needed in order to isolate Ahold's employees from any mold located in the exterior wall cavities of the Premises.  Mr. Schauder also informed Mr. Currie that the carpet should be cleaned in the hallway where elevated levels of Eurotium were discovered.

100.

Mr. Schauder instructed Mr. Currie to have the holes in the drywall sealed using plastic sheeting, craft paper, and duct tape.  Those holes were cut in the drywall by Koger Realty's employees at the request of Qore's representatives and Mr. Mackenzie.

101.

Admittedly the repair work was less than to be desired, but it does not support a finding of untenantability.

102.

Once the holes were sealed and the carpet in the hallway cleaned, Mr. Schauder recommended that Ahold perform additional air sampling in order to determine if the interim measures were successful in isolating the occupants of the Premises from any mold in the wall cavities.

103.

Only if that follow-up sampling showed a continued exposure to the occupants would Mr. Schauder have recommended vacating the Marion Building.  Further, only after that follow-up sampling would Mr. Schauder have been able to make the investigation necessary to determine the scope of any remediation needed in the Premises.

104.

Ahold and Mr. Schauder had a draft of Mr. Schauder's written report at the meeting on on December 4, 2002.  Mr. Currie asked to be given a copy of that report, but Mr. Schauder and Ahold refused to give him one.

105.

Despite Ahold's refusal to provide Mr. Currie with a copy of Mr. Schauder's report, Mr. Currie began implementing Mr. Schauder's short-term recommendations.  He had the carpet in the hallway cleaned and hired Turnkey Renovations to seal the holes that had been cut in the drywall.  However, the work on sealing the holes was not started until December 6 or 7 as a result of an ice storm in the Greenville, South Carolina area on the evening of December 4.

106.

On December 4, 2002, in response to instructions from Mr. Shull, Ms. Finley began collecting and reviewing all of Ahold's records relating to communications with Koger Realty regarding to leaking windows and other maintenance requests.  She reviewed the log that was maintained on Ahold's "C" drive and printed copies of written communications with Koger Realty.  Mr. Shull anticipated litigation with AP-Knight at the time.

107.

On December 6, 2002, Ahold began moving its employees out of the Marion Building and back to 1200 Brookfield.  This movement involved only employees on the first floor of the Leased Premises.  Space was available in the 1200 Brookfield building for those employees as a result of a reduction in force ("RIF") that Ahold had implemented in early November 2002.  The fact that room was available is consistent with the notice sent on November 7 to Keith Douglas and Kay Check.

108.

That same day (Dec. 6), Ms. Finley instructed Mr. Schauder not to perform any additional air sampling in the Leased Premises.

109.

On December 6, 2002, Ms. Medlin forwarded to Ahold's counsel in this case (Jim Blair) a copy of the lease in place for the space in the Jacobs Building and asked that he review it.  Ms. Medlin informed Mr. Blair that Ahold intended to rent space in the Jacobs Building to house the Bi-Lo employees if Ahold "could break the Marion Building lease."

110.

The people with the authority to decide to relocate the Bi-Lo employees on the Second Floor of the Marion Building were Gary Preston of Ahold and Steve Ortega of Bi-Lo.  The only document in the record referencing a conference in which both of those decision-makers participated showed that a telephone conference occurred on the afternoon of December 9, 2002.  Ahold failed to present the testimony of Mr. Preston or Mr. Ortega to clarify when they made the decision to move Bi-Lo's employees.

111.

The morning following that conference call (i.e., on Dec. 10), Ahold held a meeting at the Jacobs Building in order to plan the move of the Bi-Lo employees from the second floor of the Marion Building to the Jacobs Building.  Ms. Finley testified that Ahold would not have held the meeting to plan that move until after the decision to move had already been made.

112.

On December 11, 2004, Ms. Medlin, Mr. Schauder, and Ahold's trial counsel in this case prepared a memorandum in response to questions from Ahold's employees regarding "what we have exposed them to in the Marion Building."  That memorandum stated as follows:

> Due to leaks around the windows of the Marion Building, we recently requested that the building be tested by an environmental specialty company, ETM (Environmental Testing & Management).  ETM utilized Industrial Hygienists to conduct the testing.  Industrial Hygienists are professionals that specialize in worker health and safety.
>
> ETM conducted 18 airborne fungi tests.  Eight tests were performed on each floor of the building and two tests were conducted on the outside.  The test results indicate that four areas of the building had slightly elevated areas compareed to the outside air.
>
> Exposure to elevated areas can produce allergy-type symptoms similar to those associated with ragweed and pine pollen particularly in susceptible individuals.  Symptoms could include sinus congestion, runny nose, and other typical allergy symptoms.  Most people would experience no symptoms.  Once exposure stops, symptoms go away.
>
> Due to the repairs that will need to take place to the windows and other areas of the building, we have made a decision to move associates in order to eliminate possible disruption of our normal day-to-day work.  The move is planned for December 19.
>
> Should you have any questions relating to the above, please cntact Teresa Medlin at Ext. 5605.

31

113.

On December 12, 2002, Mr. Shull met with Ahold's attorneys in order to "finalize the lease" for the Jacobs Building.  That same day, Ms. Finley was "working with Bi-Lo and the leasing agent to ensure that they [Bi-Lo] have sufficient space" and was "drafting a preliminary floor plan."

114.

On Friday, December 13, 2002, Ahold sent written notice to AP-Knight and Fleet that AP-Knight was in default under the Lease.  That letter stated Ahold's intention to move out of the Marion Building and to stop paying rent under the Lease.

115.

That December 13 letter is the only notice relating to the condition of the Marion Building that complies with the notice requirements contained in the Lease, the Estoppel Certificate, and the Subordination Agreement.

116.

Ahold sent its December 13 notice via Federal Express.  Since December 13, 2002, was a Friday, the Court finds that the notice was not delivered to AP-Knight or Fleet Bank until Monday, December 16, 2002, at the earliest.

117.

By the time that Ahold sent its December 13 notice, Ahold had made the decision to vacate the Leased Premises permanently and nothing that AP-Knight could do would change that decision.

118.

On Friday, December 13, 2002, consistent with the statements in its notice to AP-Knight, Ahold signed an "Improvement and Indemnity Agreement" with Synnex that allowed Ahold to enter Synnex's space in the Jacobs Building and make improvements in anticipation of a sublease between Ahold and Synnex.

119.

After receiving Ahold's December 13 letter, AP-Knight delivered notice dated December 17, 2002, to Ahold that vacating the Premises and failing to pay rent would constitute independent breaches of the Lease.  Specifically, AP-Knight's notice to Ahold stated in part as follows:

> I am in receipt of your letter dated December 13, 2002, addressed to John Jacobssen and Koger Equity.  In that letter, you indicated that Tenant intended to vacate the Premises.  This letter constitutes notice to you and the Tenant that any such action will be deemed a breach of the Lease and that the Landlord will enforce the terms of the Lease based on that breach.
>
> .      .      .
>
> If the Tenant carries out its threat to vacate the Premises, the Landlord will pursue all of its rights under the Lease and applicable law, including, without limitation, declaring a default by Tenant and bringing an action against the Tenant for all base and additional rent due under the Lease through the conclusion of the Lease term, plus interest and attorneys' fees.

33

120.

Ahold moved all of its employees out of the Marion Building by December 18, 2002.  However, Ahold did not immediately remove its furniture and fixtures from the Premises.

121.

On January 10, 2003, Ahold responded to AP-Knight's notice through its counsel in this case.  In that January 10 response, Ahold again stated that it had vacated the Premises and that it intended to withhold any further rent payments.  Specifically, Ahold's counsel wrote as follows:

> Unfortunately, the Tenant has been forced to vacate the Premises due to the Landlord's failure to fulfill its obligations under the Lease and to supply an immediate solution to the acute problems related to the presence of toxic molds and other water damage and intrusion related to the problems. Although January 2003 rent has been paid to the Landlord, the Tenant will not be making any further payments under the Lease, and reserves the right to obtain a rebate from the Landlord for a portion of January's rent and to seek enforcement of such rights and remedies it may have at law and in equity, including damages and indemnity for claims arising from its employees.

122.

That same day, AP-Knight sent notice to Ahold that AP-Knight expected Ahold to continue paying rent under the Lease.  Ahold paid the base rent due in January 2003, but failed to pay the Additional Rent that was also due at that time.  Ahold failed to pay the bills for electrical service AP-Knight supplied to to the Premises beginning in January 2003.  Ahold removed its furniture and fixtures from the Premises by the end of January 2003.

123.

On February 13, 2003, AP-Knight sent notice to Ahold of its default under the Lease based on vacating the Premises.  Pursuant to the terms of the Lease, AP-Knight gave Ahold ten (10) days to cure its default.  AP-Knight also informed Ahold that if Ahold failed to cure its default, AP-Knight would exercise its right under the Lease to retake possession of the Premises without terminating the Lease and Ahold's obligation to pay rent through the end of the term.

124.

Ahold failed to pay the base rent due for the Premises starting in February 2003.  AP-Knight gave Ahold notice of its default under the Lease based on failure to pay rent.  When more than ten (10) days passed from that notice, AP-Knight sent notice of termination of Ahold's right to possession of the Premises, but did not terminate the Lease.

125.

The Court finds that, based on the terms of the Lease, Ahold owes AP-Knight the following principal amounts:

Base Rent (Principal)                    $473,556.84; and

Electricity (Principal)                  $13,280.20.

## III.     CONCLUSIONS OF LAW

### 1.

The claims and defenses in this action involve the construction of written contracts, including specifically, but without limitation, the terms of the Lease. The Lease contains a provision that requires application of South Carolina law.

### 2.

"Common sense and good faith are the key principles of construction of the provisions of a contract. In construing terms of a contract, the reviewing court must look at the language of the contract to determine the intentions of the parties. When the language of the contract is clear, explicit and unambiguous, it must be taken and understood in its plain, ordinary, and popular sense." *Goode v. St. Stephens United Methodist Church*, 329 S.C. 433, 445, 494 S.E.2d 827, 833 (Ct.App. 1997).

### A.     AP-Knight's Claim for Breach of The Lease

### 3.

The Court finds that Ahold breached the Lease when it vacated the Premises and failed to pay rent and other sums owed in accordance with the Lease. AP-Knight gave notice to Ahold of its breaches and allowed Ahold ten (10) days to cure those defaults as required by the Lease.

4.

Ahold failed to cure its default within the time allowed, thereby breaching the Lease. Thereafter, AP-Knight terminated Ahold's right to possession of the Premises without terminating the Lease and Ahold's obligation to pay rent.

5.

Based on Ahold's default under the Lease, AP-Knight contends that it is entitled to recover as damages rent and other sums that were due but which remain unpaid under the Lease. "The purpose of an award of damages for breach of contract is to put the plaintiff in as good a position as he would have been in if the contract had been performed. The proper measure of compensation is the loss actually suffered by the plaintiff as a result of the breach." *Minter v. GOCT, Inc.*, 322 S.C. 525, 528, 473 S.E.2d 67, 70 (Ct.App. 1996).

6.

The Court finds as a matter of law that AP-Knight is entitled to payment of all base rent due under the Lease from February 2003 through April 31, 2004, plus electrical charges from January 2003 through April 2004.

7.

The Court also finds as a matter of law that AP-Knight is also entitled under the terms of the Lease to interest on those unpaid sums at the rate of 18% per annum.

8.

Therefore, the Court finds that the total amount owed as of May 9, 2005, was as follows:

Base Rent (Principal)                    $473,556.84;
Utilities (Principal)                    $13,280.20; and
Pre-Judgment Interest thru 5/9/05        $138,888.12.

Total                                        $625,725.15

Additionally, the Court finds that AP-Knight is entitled to recover pre-judgment interest after May 9, 2005, at the rate of $243.42 per day until entry of final judgment.

**B.    Ahold's Defenses**

9.

Ahold contends that it was excused from paying rent under the Lease and was justified in vacating the Premises based on a breach of the Lease and constructive eviction by AP-Knight.

10.

Ahold's claim for breach of the Lease is apparently based on its contention that AP-Knight failed to deliver "peaceful and quiet enjoyment of the Premises" to Ahold pursuant to Paragraph 13 of the Lease.  The Court finds that claim is essentially identical to and rests on the same allegations as Ahold's claim for constructive eviction.

11.

The Court finds that the basis for Ahold's two defenses is AP-Knight's alleged failure "to supply an immediate solution to the acute problems related to the presence of toxic molds and other water damage and intrusion related to the problems" as stated in the letter from Ahold's counsel dated January 10, 2003.

12.

Ahold asserted at trial that AP-Knight also breached the Lease by failing to pay for indoor air quality testing.  That assertion was apparently based on a provision in the Seventh Amendment to the Lease that referred to the cost of such testing as being a cost for which Ahold was not liable as a portion of the CAM charges.  The Court finds that the Seventh Amendment did not impose an affirmative obligation on AP-Knight to perform such testing.  Rather, plain and unambiguous terms of the Seventh Amendment simply provided that any such costs, if they were incurred, were not something for which Ahold was obligated to pay as Additional Rent.

13.

As explained below, the Court finds as a matter of law that Ahold's defenses of breach of the Lease by AP-Knight and constructive eviction by AP-Knight do not excuse Ahold's failure to pay rent under the Lease or its decision to vacate the Premises.

1.    *Ahold's Burden of Proof*

14.

Ahold's defenses are affirmative defenses.  Therefore, Ahold bore the burden of proof at trial with regard to the issues raised by those defenses.  Ahold was required to prove each of the elements of its defenses by a preponderance of the evidence.  *Hoffman v. Greenville County*, 242 S.C. 34, 39, 129 S.E.2d 757, 760 (1963) (the party pleading an affirmative defense "has the burden of proving it"); *see also McCabe v. Sloan*, 184 S.C. 158, 162, 191 S.E. 905, 906 (1937) ("It seems unnecessary to cite authorities in support of the postulate that when one pleads an affirmative defense, the burden is on him to prove it.").

39

2.     *Defense of Constructive Eviction*

15.

Under South Carolina law, in order to establish a constructive eviction, Ahold was required to prove two things: (1) that AP-Knight, by some intentional act or omission, deprived Ahold of possession of the Premises or that some intentional act by AP-Knight substantially interfered with Ahold's beneficial use or enjoyment of the Premises; and (2) that Ahold gave AP-Knight notice of and a reasonable opportunity to resolve the alleged situation creating that interference. *See Genesco, Inc. v. Monumental Life Ins. Co.*, 577 F. Supp. 72 (D.S.C. 1983); *Pleasantburg Warehouse Co. v. Global Dist., Inc.*, 287 S.C. 422, 423, 339 S.E.2d 135, 136 (1985). In other words, Ahold was required to prove that AP-Knight had done something or failed to do something that made the leased premises "untenantable" *and* that AP-Knight failed to cure the problem within a reasonable time after receiving notice of it from Ahold.

16.

The term "untenantable" means "not fit to be used for the purpose it is meant to be used, and for which it is rented." *Mallard v. Duke*, 131 S.C. 175, 191-92, 126 S.E. 525, 531 (1925); *see also Overstreet v. Rhodes*, 93 S.E.2d 715, 716 (Ga. 1956) ("A rented building becomes untenantable and the tenant is constructively evicted therefrom and thereafter [is] relieved of his obligation to pay rent, when the landlord whose duty it is to keep it in a proper state of repair allows it to deteriorate to such an extent that it is an unfit place for the tenant to carry on the business for which it was rented, and when it cannot be restored to a fit condition by ordinary repairs which can be made without unreasonable interruption of the tenant's business.").

40

17.

Ahold argued at trial that a different standard for repair applied in this case based on the terms of the Management Agreements pursuant to which Koger Equity (and then Parthenon) managed the Koger Center.  Specifically, Ahold contended that it was entitled as a third-party beneficiary to the benefit of the provision of those Management Ageements that required the property manager to maintain the Marion Building "in a manner consistent with the highest industry standards customary for comparable office buildings."

18.

"Generally, a third person not in privity of contract with the contracting parties has no right to enforce a contract.  However, when the contract is made for the benefit of the third person, that person may enforce the contract if the contracting parties intended to create a direct, rather than an incidental or consequential, benefit to such third person."  *Goode*, 329 at 445, 494 at 833.  "South Carolina contract law carries a presumption that an individual who is not a party to a contract lacks privity to enforce it." *Trancik v. USAA Ins. Co.*, 354 S.C. 549, 553-54, 581 S.E.2d 858, 861 (Ct.App. 2003).

19.

Ahold was clearly not a party to the Management Agreements and has produced no evidence that would overcome the presumption that it is not entitled to the benefit of the terms of those agreements.

20.

Moreover, the Management Agreements both contain clear and unambiguous provisions that negate any assertion by Ahold that it was an intended beneficiary of the provisions relating to maintenance of the Marion Building.   Specifically, the Managements Agreements provide as follows:  "Except as otherwise specifically provided in Section 6.5, this Agreement is not intended for the benefit of any third party, and no such other third party may enforce any rights or obligations arising under this Agreement against Owner or Manager as a third party beneficiary."   Section 6.5 does not contain a provision that would benefit Ahold in this instance.   Therefore, the Court rejects Ahold's contention that some standard other than that set forth in *Mallard v. Duke* controls AP-Knight's obligations to Ahold with regard to maintenance of the Premises.

*a.     Untenantability*

21.

Ahold offered two alternative but related arguments that the Premises were "untenantable." First, Ahold argued that that the mold in the Premises was affecting the health of Ahold's employees and that the allegedly unsafe condition caused by that mold rendered the Premises not usable by Ahold.  Second, and alternatively, Ahold argued that even if the mold was not unsafe, the mold had to be remediated, and that the remediation necessary to address the mold contamination would substantially disrupt Ahold's use and enjoyment of the Premises.  The Court finds that Ahold failed to prove either contention by a preponderence of the evidence.

22.

The principal evidence that Ahold offered in support of its argument about the safety of the Premises was expert testimony regarding the alleged adverse health effects of exposure to mold. That evidence was offered in the form of testimony by Mr. Schauder and Mr. Bennett.  The Court finds that testimony is inadmissible under the standards established by Rule 702 of the Federal Rules of Evidence and the holdings in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.

23.

As the Fourth Circuit Court of Appeals noted in *Westbury v. Gislaved Gummi, AB*, "[E]xperts have the potential to 'be both powerful and quite misleading.'"  178 F.3d 257, 261 (4th Cir. 1999) (quoting *Daubert*, 509 U.S. at 595).  Therefore, "given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded."  *Id.*

43

24.

Rule 702 of the Federal Rules of Evidence provides:

> Rule 702.  Testimony by Experts
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

25.

Under Rule 702, "trial judges act as gatekeepers to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'"  *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (quoting *Daubert*, 509 U.S. at 588).  In performing that function, a court should undertake a two-step analysis.  First, the court must determine whether the expert was qualified by "knowledge, skill, experience, training, or education" to render the opinion offered.  Fed. R. Evid. 702.  Second, if the witness qualifies as an expert on the topic offered, the court must determine whether his opinions are "reliable" under the principles set forth in *Daubert* and relevant to the issues presented in the case.  *United States v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000).

26.

In *Daubert*, the Supreme Court identified several factors that may be used to assess the reliability of a witness's expert testimony.  Those factors include: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there

44

are standards controlling its use; and (4) whether the theory or technique is generally accepted within the relevant scientific community.  *Cooper*, 259 F.3d at 199 (citing *Daubert*, 509 U.S. at 592-94).  Those factors have been incorporated into the text of Rule 702; *see* Fed. R. Evid. 702, Advisory Committee Notes.

27.

The focus of the court's analysis under Rule 702 should be "to 'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  *Cooper*, 259 F.3d at 200 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).  The burden of establishing that fact falls on the party offering the testimony.  Fed. R. Evid. 702, Advisory Committee Notes ("[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

28.

There are two levels of "causation" evidence that are required to show the link between a condition or exposure and reported adverse health effects.  They are: (1) "general" causation; and (2) "specific" causation.  The two elements of causation are proven as follows:

> To prove causation in a toxic tort case, a plaintiff must show both that the alleged toxin is capable of causing injuries like that suffered by the plaintiff in human beings subjected to the same level of exposure as the plaintiff, and that the toxin was the cause of the plaintiff's injury.

*Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp. 2d 1118, 1126 (D. Minn. 2003) (quoting *Bonner v. ISP Technologies, Inc.,* 259 F.3d 924, 928 (8th Cir. 2001)); *see also Bourne v. E.I. DuPont de*

45

*Nemours & Co.*, 189 F. Supp. 2d 482, 485 (S.D.W.V. 2002) ("In a toxic tort case, a plaintiff must generally establish both general and specific causation for his injuries.").

29.

It is not sufficient for an expert to testify merely that the ailment might have resulted or could have resulted from the alleged cause.  He must go further and testify that, taking into consideration all the available data, it is his professional opinion that the result in question most probably came from the cause alleged.  The standard for establishing causation in health complaint cases in South Carolina is whether the condition which was the subject of the complaint was "to a reasonable degree of medical certainty" caused by the defendant's action or that it was "most probably" caused by the defendant's action.  *Goewey v. United States*, 886 F. Supp. 1268, 1279  (D.S.C. 1995); *Eubanks v. Piedmont Natural Gas Co.*, 198 F. Supp. 522, 526-27 (W.D.S.C. 1961); *see also Fitzgerald v. Manning*, 679 F.2d 341, 348, 350-51 (4th Cir. 1982) (applying Virginia law) ("A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant . . . .  The expert has to testify, not that the condition of claimant might have, or even probably did, come from the accident, but that in his professional opinion the result in question came from the cause alleged.  A less direct expression of opinion falls below the required standard of proof and does not constitute legally competent evidence.").

30.

Ahold offered Mr. Schauder's and Mr. Bennett's testimony to support its contention that the health complaints from Ahold's employees were caused by a defective condition in the Premises

46

(i.e., the presence of mold caused by leaking windows).  Mr. Schauder and Mr. Bennett both testified at trial that the health complaints experienced by Ahold's employees were "consistent with" exposure to airborne mold spores.  They did not offer an opinion that mold "most probably" caused the complaints or that they believed that mold was the cause of the complaints to a "reasonable degree of certainty."   Therefore, the testimony offered by Mr. Schauder and Mr. Bennett was insufficient as a matter of law to establish "specific causation" in this case.

31.

The evidence at trial was that

a.    Mold is present everywhere in the environment.  Mold is ubiquitous, and everyone is exposed to some airborne mold spores every day;

b.    Mold is present in the air inside every building to some extent, including the courtroom in which this trial occurred;

c.    There are no standards for acceptable levels of mold in indoor environments;

d.    Most people who are exposed to airborne mold have no reaction; and

e.    There are multiple other potential allergens that could have caused the symptoms reported by Ahold's complaining employees, including paper dust.

32.

Since there were multiple potential causes for the health complaints in this case and there are no known objective standards for determining medical causation of health complaints from exposure to mold, Mr. Schauder and Mr. Bennett were required to use "differential diagnosis" in order to establish causation.  *Cooper*, 259 F.3d at 200-01; *Smith v. Wyeth-Ayerst Laboratories Co.*, 278 F. Supp. 2d 684 (W.D.N.C. 2003).

47

33.

Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. In performing a differential diagnosis, an expert begins by "ruling in" all scientifically plausible causes of the plaintiff's injury. The expert then "rules out" the least probable causes of injury until the most likely cause remains. *Wyeth-Ayerst Laboratories*, 278 F. Supp. 2d at 690 ; *Galstetter v. Novartis Pharmaceuticals Corp.*, 252 F.3d 986, 990 (8th Cir. 2001); s*ee also Daubert*, 509 U.S. at 593 ("Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified. . . .").

34.

It is not necessary for the expert to conclusively eliminate all other possible causes of the complaint in order to create a valid differential diagnosis. However, a differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation. Thus, if an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, the Court may exclude an expert's testimony. *Cooper*, 259 F.3d at 201-02; *see also Roche v. Lincoln Properties*, 278 F. Supp. 2d 744, 751 (E.D. Va. 2002) (the expert must show that he or she has taken "serious account of other potential causes" before reaching a conclusion as to the condition that is more likely than not the cause of the injury), *vacated on procedural grounds*, 373 F.3d 610 (4th Cir. 2004) (vacated based on lack of subject matter jurisdiction).

35.

In order to reach an opinion that the levels of airborne mold measured in the Premises most probably were the cause of Ahold's employees' complaints, Mr. Schauder was required to seriously consider all of the other possible causes of those complaints and offer some explanation for why they were not to blame.  The Court finds that there exist a number of other plausible causes of the health complaints in this case.  Those other causes include the presence of dust or dust mites, pollen, lack of fresh air in the space caused by overcrowding, increased $CO_2$ levels, and psychological factors.  All of those factors are plausible explanations for the complaints of the complaining employees.  That conclusion is supported by the following facts:

a.  The employees began complaining during the late summer, a peak period for pollen;

b.  The employees began complaining shortly after Ahold increased the number of employees in the Premises by almost two and one-half times, potentially increasing carbon dioxide concentrations in the building;

c.  They began complaining shortly after Ahold's sister company, Bi-Lo, moved fifteen tons of old paper records into the building;

d.  They began complaining shortly after Bi-Lo began having large amounts of mail delivered to the Premises five or six times per day, resulting in the outside door being opened and left open during the process;

e.  They began complaining shortly after mold exposure was "front page news" as the result of school closings;

f.  The employees expressed strong dissatisfaction with the fact that they were moved out of the company's new headquarters building and into the older, less desirable Marion Building;

g.  They sat in close proximity to one another; and

h.  The records that Ahold maintained showing sick leave taken by its employees does not show a marked increase in sick leave until after Bi-Lo moved into the second floor of the Premises.

36.

Mr. Schauder admitted that he did nothing to investigate and eliminate those other possible causes.  He did no sampling for indoor air temperature, relative humidity, or $CO_2$ levels in the Premises.  He did not inspect the HVAC system in order to determine how much fresh air was being brought into the Premises through that system.  He did not interview the complaining employees in order to explore the temporal relationship between the onset of their complaints and other events (including the occupancy of the second floor of the Premises).  He failed to seek any medical confirmation of the cause of the complaints.

37.

The Court finds that Mr. Schauder's failure to investigate indoor air temperature, relative humidity, and $CO_2$ content, and his failure to involve a medical doctor in the response to the complaints from Ahold's employees, deviates from the standard employed by professionals involved in the practice of industrial hygiene.  The Court further finds that Mr. Schauder's reported results were suspect as a result of his failure to follow basic quality assurance and quality control procedures during his investigation.  Those conclusions are based on the following:

a.    The trial testimony of Mr. Bennett and Dr. Varney;

b.    The evidence relating to the observations and recommendations that Mr. MacPhee of Qore made based on his inspection of the Premises;

c.    The procedures that Mr. Schauder followed in other similar investigations for Bi-Lo and the Greenville County School System; and

d.    The procedures followed by Mr. Bennett in an investigation that he performed for the Greenville County School System.

50

38.

Based on the foregoing, the Court finds that Mr. Schauder's testimony and opinions regarding the cause of the health complaints from Ahold's employees are inadmissible under Rule 702.

39.

Mr. Bennett performed no independent investigation of the conditions at the Marion Building.  He relied solely on Mr. Schauder's defective work.  Therefore, Mr. Bennett's testimony and opinions with regard to the issue of causation of the complaints from Ahold's employees are similarly inadmissible under Rule 702.  *See* J. Wylie Donald, *Mold Spore Counting: Is it Admissible Science?*, FOR THE DEFENSE, August, 2005, at 32 (summarizing flaws in mold spore counting techniques).

40.

In South Carolina, a plaintiff attempting to establish causation of a medically complex condition must provide expert testimony on the subject.  *Smith v. Michelin Tire Corp.*, 320 S.C.296, 298, 465 S.E.2d 96, 97 (Ct.App. 1995); *see also Lorick v. South Carolina Elec. & Gas Co.*, 245 S.C. 513, 141 S.E.2d 662 (S.C. 1965) (stating that medical causation should be established with expert testimony in all but simple cases).  Therefore, although Ahold presented testimony from five complaining employees, that testimony alone was insufficient to establish causation in this case.

41.

The Court finds, alternatively, that Mr. Schauder's and/or Mr. Bennett's testimony, even if admissible under Rule 702, fails to establish that the presence of airborne mold rendered the Premises untenantable or unfit for use as an office building.  That finding is based on the following facts:

   a.  The levels of airborne mold spores in the Premises were in all cases extremely low and were consistently less than the outside air;

   b.  The levels of airborne mold in the Premises were in all cases less than what Mr. Schauder stated to Mr. Shull and to another client in an unrelated circumstance would be considered "normal" for buildings in Greenville, South Carolina;

   c.  There was no noticable increase in absenteeism among the complaining during the time that they were present in the Marion Building and the time periods before and after; and

   d.  The levels of airborne mold were significantly lower than levels that Mr. Schauder found inside Travelers Rest High School in January 2000, and Mr. Schauder did not recommend vacating that school.  In fact, Mr. Schauder opined that the mold growing in Travelers Rest High School did not even have to be removed until after the school year ended, four months after his report was published.

The Court finds particularly significant the statement prepared by Ahold, Mr. Schauder and Ahold's trial counsel in this case in response to inquiries from the complaining employees.  In that statement, Ahold wrote as follows:

   a.  "The test results indicated that four areas of the building had slightly elevated areas as compared to the outside air;"

   b.  "Exposure to elevated areas can produce allergy-type symptoms similar to those associated with ragweed and pine pollen particularly in susceptible individuals;" and

    c. "Most people would experience no symptoms" from such an exposure.

42.

The evidence that Ahold offered in support of its argument that remediation activities necessary to respond to the mold contamination would have rendered the Premises untenantable was in the form of opinion testimony from Mr. Schauder and Mr. Zitzke.

43.

Ahold also offered testimony from a number of witnesses (including Mr. Schauder and Mr. Shull) regarding the number of windows that allegedly were leaking, the extent of the resulting damage to drywall, and Ahold's repeated reports to Koger Realty of those problems. The Court is unpersuaded by that testimony for the following reasons:

    a. Ahold has failed to produce the log that it maintained on its "C" drive prior to September 18, 2002. It is undisputed that the log existed after this dispute arose as Ms. Finley reviewed it on December 4 in order to identify the dates of communications with Koger Realty;

    b. The documents that Ahold has produced (and that Ms. Finley was able to locate after reviewing the missing log) contain only one mention of leaking windows prior to September 2002 and there is no mention of damaged drywall prior to that date;

    c. The photographs that were introduced into evidence, including photographs taken in December 2002, do not show extensive water damage;

    d. Mr. MacPhee, a party with no interest in the outcome of this litigation, described the leaks around the windows as "minor water intrusion problems;"

    e. Mr. Schauder failed to take measurements of moisture content in the Premises, even though that test is simple and non-invasive; and

    f. Mr. Schauder destroyed his field notes from his inspections of the Premises. Those documents would have provided evidence of his observations at that time.

53

"[W]hen a party loses or destroys evidence, an inference may be drawn that the destroyed or lost evidence would have been adverse to that party." *Gathers*, 311 S.C. at 83, 427 S.E.2d at 689.

44.

The Court finds that Ahold's argument regarding potential interference with its use of the Premises by remediation activities is unsupported by any admissible evidence. First, Mr. Zitzke was unqualified under Rule 702 to opine as to the scope of work that was necessary to remediate any mold contamination in the Premises. Therefore, he had no basis for assessing the impact that the scope of any required remediation might have on Ahold's use of the Premises. Second, Mr. Schauder admitted that he had not performed the investigation necessary in order to assess the scope of remediation that was necessary. Therefore, despite his qualification as an expert on issues relating to the scope of mold remediation generally, he had no basis other than speculation to support any opinion regarding the scope of the actual remediation necessary in this case or the impact it might have on Ahold's use of the Premises.

*b. Notice to AP-Knight and Opportunity to Cure*

45.

The Court also finds that Ahold failed to prove that it gave AP-Knight notice of the conditions about which it complains and a reasonable time to cure before vacating the Premises.

46.

Under the Lease, all notices had to be in writing.  The Court finds that the plain language of the Estoppel Certificate and the Subordination Agreement required that Ahold copy Fleet Bank on all correspondence other than routine correspondence relating to the Lease and the Premises.

47.

The Court further finds that the plain language of the Subordination Agreement prevented Ahold from taking steps to terminate the Lease, including a termination based on its constructive eviction defense in this case, without permitting thirty (30) days for a cure from Fleet Bank's receipt of the notice.

48.

The Court further finds as a matter of law that AP-Knight was entitled to the benefit of the notice and cure provisions contained in the Estoppel Certificate and the Subordination Agreement based on the clear and unambiguous terms of those documents.

49.

The Court finds as a matter of law that the only notice from Ahold to AP-Knight and Fleet Bank that complies with the requirements of the Lease, the Estoppel Certificate, and the Subordination Agreement is the letter dated December 13, 2002.

50.

The Court finds as a matter of law that Mr. Preston and Mr. Ortega made the decision to move the Bi-Lo employees out of the second floor of the Marion Building and to break the Lease with AP-Knight on December 9, 2002.  That finding is based on the following:

a.    The only evidence in the record showing a meeting in which both of the decision-makers participated shows a telephone conference on the afternoon of December 9;

b.    The evidence shows that Ahold held a meeting to begin planning the movement of the Bi-Lo employees from the Marion Building to the Jacobs Building on the morning of December 10 and that such a meeting would not be held until a decision to move had been made; and

c.    Ahold failed to provide testimony from either Mr. Preston or Mr. Ortega.

The Court is permitted to infer from the absence of testimony from Mr. Preston, a witness within Ahold's control to produce at trial, that his testimony would be adverse to Ahold's interests.  *Baker v. Port City Steel Erectors, Inc.*, 261 S.C. 469, 200 S.E.2d 681 (1973).

51.

"The repudiation of a contract before the time for performance has arrived amounts to a breach or tender of breach of the entire contract.  . . .  An anticipatory breach of contract is committed before the time when a present duty of performance has arisen, and is the outcome of words or acts evincing an intention to refuse to perform in the future."  17A Am. Jur. 2d *Contracts* § 716.

56

52.

Upon the occurrence of an anticipatory breach of contract, the non-breaching party is excused from any obligation to continue tendering performance under the contract.  17A Am. Jur. 2d *Contracts* § 717 ("Although the plaintiff need not continue to perform after the other party has anticipatorily repudiate a contract, the plaintiff must still demonstrate, to recover damages, that he or she had the willingness and ability to perform before the repudiation and would have performed if the defendant had not repudiated.").

53.

In Ahold's December 13 letter, Ahold stated its present intention to cease paying rent and to vacate the Premises.  Since Ahold had not previously given AP-Knight notice and an opportunity to correct the alleged defective conditions identified in that notice, Ahold's December 13 letter constituted an anticipatory breach of the Lease.

54.

Ahold never withhdrew or repudiated its anticipatory breach.  In fact, the Court finds that Ahold had irrevocably made the decision by at least December 9 to vacate the Premises and stop paying rent.  As a result, the inspections that Ahold's witnesses (Mr. Zitzke and Mr. Schauder) performed of the Premises after that date, including the inspection of the temporary repairs made by Koger Realty inside the Premises, on December 10 or 11 and the testimony relating to any conclusions they drew relating to the quality or effectiveness of those repairs are irrelevant.

55.

In a letter from its counsel in this case dated January 10, 2003, Ahold restated its intention to vacate the Premises and to cease paying rent, thereby confirming its anticipatory repudiation of the Lease.

56.

In letters dated December 18, 2002, and January 10, 2003, AP-Knight stated its intention to perform under the Lease.  The Court finds that AP-Knight was ready and able to perform under the Lease absent Ahold's breach.

57.

Based on Ahold's anticipatory repudiation of the Lease, AP-Knight was excused from any further obligation to perform under the Lease, including any obligation to investigate and/or correct any allegedly defective conditions.  Therefore, the evidence that Ahold introduced at trial relating to events after December 13 is irrelevant to the resolution of this case.

58.

Even if the oral notices from Ahold to Koger Realty prior to December 13, 2002, are deemed notice to AP-Knight of the allegedly defective conditions, the Court finds that AP-Knight took reasonable and timely steps in response to Ahold's concerns.  That conclusion is based on the following facts:

    a.    When Ahold complained about leaking windows in May 2002, Koger Realty's on-site personnel caulked the windows.  There is no evidence that

58

Ahold objected to that as an improper response, and there is no evidence of continuing complaints about leaks in those windows;

b.    When Ahold met with Mr. Currie on September 18, 2002, and informed him for the first time that windows were leaking in the Marion Building, he had the windows caulked by Koger Realty's on-site personnel;

c.    When Ahold requested on September 18, 2002, that Mr. Currie take action to investigate and repair water damage to drywall beneath the leaking windows, he immediately hired Turnkey Renovations to perform that work. Mr. Mackenzie from Ahold's Facilities Group inspected the wall cavity in the "POS Lab" after Koger Realty had that work performed and saw no mold present there;

d.    When Ahold requested on September 18, 2002, that Mr. Currie hire a consultant to perform air quality testing, he informed Ahold that Koger Realty would hire Carolina Air Care to perform the tests. Ahold rejected that consultant and informed Mr. Currie that Ahold would retain someone else;

e.    When Ahold complained in December about leaking windows, Koger Realty had its on-site maintenance personnel caulk the windows that Ahold identified as leaking as an interim measure;

f.    When Koger Realty discovered that the caulking had not stopped the leaks in a series of windows, Koger Realty performed further inspections and determined that the leaks in that area resulted from a crack in the masonry on the exterior of the building. Koger Realty had that crack caulked and no further leaks occurred in that area;

g.    When Mr. Schauder instructed Koger Realty regarding the scope of certain interim work to be performed, that work was begun within just a few days; and

h.    When Mr. Schauder informed Koger Realty that its work was not adequate, Koger Realty immediately took steps to correct the defects identified.

### 3.     *Defense of Breach of Lease*

59.

Ahold's claim for breach of the Lease arises from the same factual allegations as the defense of constructive eviction.

60.

The Court finds that AP-Knight was entitled under the plain and unambiguous terms of the Lease, as modified by the Estoppel Certificate and the Subordination Agreement to thirty (30) days notice of any alleged default and an opportunity to cure any alleged defect.

61.

As was true with regard to Ahold's constructive eviction defense, the only notice that complies with the requirements of the Lease, the Estoppel Certificate, and the Subordination Agreement was the December 13 letter from Ahold's counsel.

62.

However, Ahold did not give AP-Knight notice of an alleged defect in that letter and notice to cure. Rather, Ahold stated its intention to vacate the Premises and cease paying rent. As noted above, that constituted an anticipatory repudiation of the Lease and excused AP-Knight from further obligation under the Lease, including any obligation to repair or maintain the Premises.

63.

Therefore, Ahold's defense based on AP-Knight's alleged breach of the Lease fails as a matter of law.

**C.     Ahold's Damages**

64.

Ahold presented evidence at trial of its purported damages flowing from the alleged constructive eviction and breach of the Lease by AP-Knight.  The Court finds that such damages would not be recoverable even if the Court found in favor of Ahold on its claims in this case.

65.

As noted above, the award of damages for breach of contract is intended to place the plaintiff (or counterclaim plaintiff) in the same position as if the contract had been fully performed.  *Minter*, 322 S.C. at 526, 473 S.E.2d at 68.

66.

There are items of damages that Ahold has included in its damages claim that do not result from any alleged breach of the Lease.  Specifically, the Court concludes that Ahold would not be entitled to the following:

a.     Attorneys' fees paid to Synnex in connection with the execution of the sublease for the Jacobs Building ($4,382.60);

b.     Attorneys' fees paid to Ahold's counsel in this case ($41,122.53);

c.     Costs paid to BellSouth ($13,145.00);

61

d.     The cost of ordering keys in April 2002 for use during the occupancy of the Premises ($63.00);

e.     The cost of supplies used to move Ahold's employees from the first floor of the Marion Building in early December 2002 since those employees were to be relocated without regard to AP-Knight's alleged breach ($700.00);

f.     The cost of labor used to move Ahold's employees from the first floor of the Marion Building in early December 2002 since those employees were to be relocated without regard to AP-Knight's alleged breach ($313.44);

g.     The cost of a new ice machine incurred in February 2003 to replace the old machine after Ahold had already moved to the Jacobs Building ($1,872.40); and

h.     Security guard service at the Jacobs Building beginning on December 1, 2002, before Ahold had moved out of the Premises.

67.

Ahold seeks damages based on the cost of moving from the Marion Building to replacement premises and up-fitting those premises for its use.  However, the Court concludes that those costs would not establish Ahold's loss as a result of AP-Knight's alleged breach of the Lease.  That conclusion is supported by the following facts:

a.     Ahold did not own the Premises and its right to occupy the Premises would terminate under the terms of the Lease on April 31, 2004;

b.     Ahold's long-range business plan included consolidating its employees in space closer to 1200 Brookfield, namely the Jacobs Building.  Therefore, Ahold would not have exercised its right to renew the Lease;

c.     Under the terms of the Lease, Ahold would have been required to return the Premises to AP-Knight at the conclusion of the Lease term in the same condition as it existed when Ahold vacated the Premises in December 2002 and January 2003;

d.     Therefore, Ahold would have incurred the same costs and expenses at some point (namely in 2004) that it incurred in vacating the Premises in December 2002 and January 2003;

62

e.  Ahold would have been required to incur costs associated with the up-fit of the Jacobs Building in order to make use of that space; and

f.  The work that Ahold did in the Jacobs Building has benefit to it throughout the term of its occupancy, not just during the balance of the term of the Lease.

Therefore, the Court concludes that Ahold's only possible complaint is that it incurred these costs 15 to 16 months earlier than it would have otherwise.

68.

Furthermore, the Court concluded in response to a motion for directed verdict from AP-Knight at the trial of this case that any liability from AP-Knight to Ahold in this case is limited by the plain and unambiguous terms of the Lease. Pursuant to paragraph 29 of the Lease, neither AP-Knight nor its general or limited partners have any personal liability to Ahold. Ahold's sole remedy in this case is entry of a lien against AP-Knight's interest in the Marion Building.

## IV.     CONCLUSION

In conclusion, The Court had an opportunity to evaluate the credibility of the witnesses, and on the issues presented by those witnesses the Court finds AP-Knight's witnesses to be more credible. This is a dispute which the Court believes could have been avoided. It is clear to the Court, however, that Ahold's intent was to breach the lease. Ahold used the environmental issue to do so. Having said that, the Court notes that the principal reason that Ahold's legal arguments fail is that Ahold failed to prove causation.

Based on the above findings of fact and conclusions of law, the Court concludes that AP-Knight is entitled to judgment for rent due under the Lease and accrued pre-judgment interest in the following amounts: $486,837.04 in principal and $138,888.12 in pre-judgment interest through May

9, 2005, and $243.42 per day in pre-judgment interest thereafter until entry of final judgment.  The Court further concludes that AP-Knight is entitled under the plain and unambiguous terms of the Lease to recover its costs and expenses of this litigation, including reasonable attorneys' fees.  AP-Knight is directed to submit an affidavit of counsel setting forth the amount and reasonableness of the fees and expenses that it has incurred in this matter.  That affidavit shall be submitted within thirty (30) days from entry of this Order.

As a result of the Court's decision, all pending motions are deemed **MOOT**.

Therefore, the Court finds that **JUDGMENT** should be, and hereby is, **AWARDED** to the Plaintiff, AP-Knight in the amounts and particulars set forth in this Order.

**IT IS SO ORDERED**.

Signed this 29th day of September, 2005, in Spartanburg, South Carolina.

s/ Henry F. Floyd
HENRY F. FLOYD
UNITED STATES DISTRICT JUDGE